Matthew Campbell
FEDERAL DEFENDERS OF EASTERN WASHINGTON AND IDAHO
10 North Post, Suite 700
Spokane, Washington 99201
(509) 624-7606

Attorneys for Defendant

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
(HONORABLE FRED VAN SICKLE)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CR-13-0167-FVS |
| | ) | |
| vs. | ) | Notice of Review of PSR and |
| | ) | Sentencing Memo |
| MAURICIO TEJEDA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**I.    Notice of review of PSR**

Undersigned counsel has reviewed the PSR with Mr. Tejeda.  Mr. Tejeda has no objections to the PSR.

**II.    The sentence agreed upon in the plea agreement is sufficient and no longer than necessary**

Mr. Tejeda respectfully requests that the Court follow the Rule 11(c)(1)(c) plea agreement in all respects. While the agreed-upon sentence is below that set forth in the guidelines, it is appropriate under the factors set forth in 18 U.S.C.   § 3553(a).

Notice of Review of PSR
and Sentencing Memorandum

1

1    **A.      The Sentencing Guidelines are advisory only**

2        This Court has the discretion to impose a sentence which is reasonable in light

3    of the factors set forth in 18 U.S.C § 3553(a) in addition to consideration of the

4    applicable Guideline range.  *See, United States v. Booker*, 543 U.S. 220 (2005).  The

5    Court is guided by the language of 18 U.S.C. § 3553(a) that a sentence should be

6    sufficient, but not greater than necessary to comply with the purposes set forth in the

7    rest of the section.

8        The Sentencing Reform Act requires judges to consider the Guidelines

9    "sentencing range established for...the applicable category of offense committed by

10   the applicable category of defendant as set forth in the guideline," § 3553(a)(4), the

11   pertinent Sentencing Commission policy statements, the need to avoid unwarranted

12   sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1),

13   (3), (5)-(7). And the Act nonetheless requires judges to impose sentences that reflect

14   the seriousness of the offense, promote respect for the law, provide just punishment,

15   afford adequate deterrence, protect the public, and effectively provide the defendant

16   with needed educational or vocational training and medical care. § 3553(a)(2).

17       In *Rita v. United States*, the United States Supreme Court revisited the *Booker*

18   decision with regards to whether the Sentencing Guidelines should be presumed

19   reasonable.  551 U.S. 338 (2007).  The Court held that a court of appeals may apply

20   a presumption of reasonableness to a district court sentence that reflects a proper

21   application of the Sentencing Guidelines. *Rita*, 551 U.S. at 347-349. In its holding,

22   the Court considered that normally the sentencing judge will consider the reasons

23

24   Notice of Review of PSR
     and Sentencing Memorandum

articulated in Section 3553(a); and that the Sentencing Guideline Commission has also taken into account the Section 3553(a) factors in designing the guidelines. *Id*.

However, the Court also noted that the presumption of reasonableness is an appellate presumption: the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply. *Id*. The sentencing court will hear arguments by the parties that the Guidelines sentence should not apply, perhaps because the case falls outside the "heartland" to which the Commission intends individual Guidelines to apply or perhaps because the guidelines sentence itself fails properly to reflect section 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. *Id*. The appellate presumption of reasonableness is based upon the general assumption that the guidelines are the product of careful study based upon extensive empirical evidence. *Id*. However, as discussed *infra*, not all guidelines are tied to this empirical evidence. *Gall v. United States*, 552 U.S. 38, 45 n.2 (2007). The Supreme Court has further held that a district court can sentence a person below an advisory guideline range based solely on policy disagreements with the guidelines when the guideline fails to embody an empirical approach. *See*, *e.g., Kimbrough v. United States*, 552 U.S. 85, 108-111 (2007).

**B.    The Child Pornography Guidelines Are Not the Result of Careful Study and Consideration**

Courts have long recognized the crucial role that the Sentencing Commission's expertise plays in federal sentencing. Emphasizing the importance of

Notice of Review of PSR
and Sentencing Memorandum

1  the Commission's national experience and empirical studies, in 2006, the Seventh

2  Circuit asserted that "the sentencing guidelines represent 18 years of careful thought

3  about appropriate sentences for federal criminal offenders." *United States v.*

4  *Robinson*, 435 F.3d 699, 701 (7th Cir. 2006) (emphasis added).  The sentencing

5  guidelines have been utilized because the "Commission is uniquely qualified to

6  conduct studies using its vast database, obtain the views and comments of various

7  segments of the federal criminal justice community, review the academic literature,

8  and report back to Congress in a timely manner."  *See* U.S. Sentencing Commission,

9  Fifteen Years of Sentencing: An Assessment of How Well the Federal Criminal

10  Justice System is Achieving the Goals of Sentencing Reform, at xvii (2004).

11       However, the Commission has acknowledged that the goals of sentencing

12  reform have not been fully achieved because "in some cases, the results of research

13  and collaboration have been overridden or ignored . . . through enactment of

14  mandatory minimums or specific directives to the Commission."  *Id.*  Courts

15  generally assume that the guidelines are the product of careful study based on

16  extensive empirical evidence.  *See Rita v. United States*, 127 S.Ct. 2456, 2464-65

17  (2007).  However, the Supreme Court has recognized that "not all of the Guidelines

18  are tied to this empirical evidence." *Gall v. United States*, 128 S.Ct. 586, 594 n.2.

19  (2007); *see also Kimbrough v. United States*, 128 S.Ct. 558 (2007).  The child

20  pornography guidelines are precisely the type of flawed guidelines referenced in *Rita*

21  and *Gall*.

22

23

24  Notice of Review of PSR
    and Sentencing Memorandum

The child-pornography sentencing guidelines, U.S.S.G. §§ 2G2.1-.2, like the drug guidelines at issue in *Kimbrough v. United States*, 552 U.S. 85 (2007),[1] are atypical in that they were not based on the Sentencing Commission's nationwide empirical study of criminal sentencing. "In the main, the Commission developed Guidelines sentences using an empirical approach based on data about past sentencing practices." *Kimbrough*, 128 S.Ct. at 567. But the guidelines for child-exploitation offenses were not crafted this way. Instead, "[m]uch like policymaking

---

[1]    In *Kimbrough*, the Supreme Court found that "[t]he crack cocaine Guidelines . . . do not exemplify the Commission's exercise of its characteristic institutional role" because the Commission looked to the mandatory minimum sentences set in the 1986 Act in formulating guideline ranges for crack cocaine offenses. *Kimbrough*, 128 S.Ct. at 574. The sentencing guidelines for crack offenses were less deserving of a district court's deference because the Commission did not formulate the crack/powder differential through its usual mechanism of conducting empirical research into sentencing outcomes. *Kimbrough*, 128 S.Ct at 575. When the Commission blindly follows or exacerbates a congressional mandatory minimum with guidelines that are not based on empirical evidence or the Commission's experience, the courts are free to reject those guidelines. *See Kimbrough*, 128 S.Ct. at 567-68, 571-72, 574-75; *Gall*, 128 S.Ct. at 594 and n.2.

Notice of Review of PSR
and Sentencing Memorandum

in the area of drug trafficking, Congress has used a mix of mandatory minimum penalty increases and directives to the Commission to change sentencing policy for sex offenses." U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 72-73 (November 2004), available at http://www.ussc.gov/15_ year/15_year_study_full.pdf.

The evolution of the child pornography guidelines demonstrates that it was driven by political concerns separate and apart from careful study by the commission. For the first three years of the Guidelines regime, the provisions of § 2G2.2 were the result of careful study by the Sentencing Commission, devoid of serious interference by outside forces. *See* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* at 3-4. At that time, the offense of transporting, receiving or trafficking in child pornography had a base offense level of 13, with a two-level enhancement if the offense involved a minor under twelve years old and a five-level enhancement if it involved distribution (for less than $100,000).

The Guidelines as a reflection of the careful consideration by the Sentencing Commission began to veer off the rails in 1990, when simple possession of pornography was criminalized by Congress. The Sentencing Commission enacted carefully considered responses. Certain members of Congress inserted legislation into an unrelated appropriations bill directing the Sentencing Commission to undo its careful amendments and make the applicable guidelines considerably harsher.

Notice of Review of PSR
and Sentencing Memorandum

No debate was held on this legislation.  When this amendment was considered in the House, the Chair of the Sentencing Commission strongly objected to it.  The Amendment passed by a wide majority.  This strong-arm, uninformed approach by Congress continued over the intervening years, thereby eviscerating the traditional role of the Sentencing Commission in conducting careful study based on empirical data in formulating the guidelines.

The child pornography guidelines have been generally enacted in response to harsh congressional mandatory minimums.  *See United States v. Baird*, 2008 WL 151258 (D. Neb. Jan. 11, 2008); *United States v. Shipley*, 2008 WL 2470001 (S.D. Iowa June 19, 2008); *United States v. Hanson*, 2008 WL 2486336 (E.D. Wis. June 20, 2008).  In 2003, two attorneys at the Department of Justice convinced a novice Congressman, Tom Feeney, to insert drastic changes to the child pornography Guidelines into an unrelated, popular bill, without notice to the Sentencing Commission.  *See* Skye Phillips, *Protect Downward Departures: Congress and the Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y 947, 976-984 (2004) (hereinafter "Phillips").  This additional component of the Protect Act drastically changed the statutory penalties for child pornography offenses including U.S.S.G. § 2G2.1.  *See* U.S. Sentencing Guidelines Manual § 2G2.1, Amendment 664, Supplement to Appendix C (Nov. 1, 2004 through Nov. 1, 2006).

The purpose of the Protect Act was to reconcile various bills, establish a nationwide Amber Alert system to be used in cases of child kidnaping, and to address virtual child pornography.  *Phillips* at 967-984.  As the legislation

Notice of Review of PSR
and Sentencing Memorandum

1   progressed, Freshman Congressman Tom Feeney proposed an unrelated amendment

2   to the bill that would directly amend various Guidelines and would bar downward

3   departures not sponsored by government attorneys.  *Id.; See also United States v.*

4   *Detwiler*, 338 F.Supp.2d 1166, 1170-71 (D. Or. 2004).  The technical amendments

5   to 2G2.2 and 2G2.4 were a minor component of the sweeping changes contained in

6   the amendment and no opportunity for study or research into their affect was

7   possible.  Representative Feeney later admitted he was just the "messenger" for two

8   Justice Department officials who authored the provision and chose not to notify or

9   consult the Sentencing Commission.  *See* Phillips*, ante*, at 983 & n. 185.  Debate on

10  the Feeney amendment was limited to twenty minutes.  Phillips, at 983 and n. 187.

11  Despite objections by the Sentencing Commission, the Chairman of the House

12  Committee on the Judiciary, the Judicial Conference of the United States, and the

13  American Bar Association, that the proposed Feeney amendment was made without

14  adequate review and analysis, the Protect Act became law on April 30, 2003.

15  Phillips, at 990- 92, 991 n. 219.[2]

16

---

17  [2]        Numerous members of Congress objected to these changes, and the

18  procedure by which they were introduced, including Senators Ted Kennedy and

19  Patrick Leahy. *Id* at n.215. Senator Leahy explained, "The substance of the Hatch-

20  Sensenbrenner amendment – whether in the form that was voted on in conference,

21  or in the form that was circulated after the conference adjourned – is just as

22  outrageous as the way in which it was adopted.  This amendment modifies in very

23

24  Notice of Review of PSR
    and Sentencing Memorandum

Contained in both the original Feeney Amendment and the final version of the Protect Act, was a direct amendment to U.S.S.G. §§ 2G2.2 and 2G2.4, adding up to a five-level increase depending on the number of images possessed. *See Protect Act*, Pub.L. 108-21, § 401(i)(1)(B),©.  The Act also directly amended § 2G2.4 by adding an enhancement for "material that portrays sadistic or masochistic conduct." *Id*.  The Act directed the Commission to expand the range of the "pattern of abuse" enhancement to make it encompass single-victim, opportunity offenses commonly associated with the prosecution of Native Americans.  *See* U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: *An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (2004), available at http://www.ussc.gov/15_15year/15year.htm at 73. Finally, the Protect Act also adjusted mandatory minimum sentences and statutory sentencing maximums for child pornography offenses.  No research, study, body of experience, or rationale, was provided to justify the arbitrary specific offense enhancement amounts, nor the choice of the triggering quantities for the two to five point enhancement related to the number of images of child pornography.  Nor was there

---

limited ways the Feeney amendment, which was added to the bill on the House floor after only 20 minutes of debate. This far-reaching proposal will undermine the federal sentencing system and prevent judges from imposing just and responsible sentences." *Id.; See also* 149 Cong. Rec. S5137-01, 5145 (daily ed. Apr. 10, 2003) (statement by Sen. Leahy).  (Exh. A at 20-21).

Notice of Review of PSR
and Sentencing Memorandum

9

1    any justification provided for § 2G2.4(b)(4)'s new 4-level enhancement.  The Protect

2    Act increased the mandatory minimum term of imprisonment from 10 to 15 years for

3    offenses related to the production of child pornography under 18 U.S.C.    § 2251.

4    U.S. Sentencing Guidelines Manual § 2G2.1, Amendment 664, Supplement to

5    Appendix C (Nov. 1, 2004 through Nov. 1, 2006).

6         These dramatic changes to the guidelines do not result from reflective study,

7    nor conscientious debate in Congress, but the changes instead result from the actions

8    of two unknown authors within the Department of Justice.  Instead, Congress

9    hijacked the authority and role of the Sentencing Commission for political gain.  *See*

10   Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed*

11   *Progression of the Child Pornography Guidelines* at 21-24.  It seems that no

12   research, study, body of experience, or rationale, was provided to justify the drastic

13   increase in punishment for these types of offenses.  Rather, it seems that these

14   changes were made as a knee-jerk response to be perceived as 'tough on crime.'

15   This is analogous with the recently amended crack guidelines which also were not

16   developed under the empirical approach.

17        Since it was the Commission's failure to exercise its "characteristic

18   institutional role" that persuaded the Supreme Court that district courts possess the

19   discretion to sentence below the crack guidelines based on policy disagreements, *see*

20   *Kimbrough*, 128 S.Ct. at 575, sentencing judges possess the same discretion when

21   dealing with the child-exploitation guidelines.[3]  This argument was developed by

22   _____

23       [3]    For a more detailed analysis of the flaws in the sentencing guidelines

24   Notice of Review of PSR
and Sentencing Memorandum

federal defender Troy Stabenow in a 2008 paper subsequently revised in 2009–

Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (January 1, 2009). District courts have repeatedly cited Stabenow's article for the proposition that the child-pornography guidelines' lack of empirical support provides sentencing judges the discretion to sentence below those guidelines based on policy disagreements with them.  *E.g., United States v. Shipley*, 560 F.Supp.2d 739, 744-46 (S.D.Iowa 2008); *United States v. Hanson*, 561 F.Supp.2d 1004, 1008-12 (E.D.Wis.2008);  *United States v. Baird*, 580 F.Supp.2d 889, 894-96 (D.Neb.2008); *United States v. Grober*, 595 F.Supp.2d 382 (D.N.J. 2008).

Several of the enhancements incorporated into § 2G2.2 – use of a computer, material involving a pre-pubescent minor, number of images and material portraying depictions of violence – are sources of significant unnecessary inflation in possession cases.  One of the many flaws with U.S.S.G. § 2G2.2 today is that a common, first-time offender can chart at or near the statutory maximum, regardless of Acceptance of Responsibility and Criminal History.  These enhancements simply do not account for the realities of today's rapid pace of technological development and the prominent and fundamental role computers play in all child pornography cases.  The results are illogical; Congress set the statutory range for first time

---

relating to child pornography offenses, see Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (January 1, 2009) (Exh. A).

Notice of Review of PSR
and Sentencing Memorandum

11

distributors as five to twenty years.  Congress could not have intended for a common first-time offender with no prior criminal history and no history of contact with minors to receive a sentence at or near the statutory maximum.

Computers are now used for any matter of mundane daily activities: buying a plane ticket, ordering a product, paying a bill.  They also arguably provide the most common means of communication.  Use of a computer for any purpose is, in this day and age, much more the rule rather than the exception. The 2010 U.S. Census shows that 78% of adults reported computer use in 2009, and 79% reported internet use. (See: http://www.census.gov/compendia/statab/2010/tables/10s1121.pdf).  To rely on a factor that is mundane, common, and unexceptional as the basis for a two level enhancement means that the majority of cases will trigger the enhancement, which in turn means that for all intents and purposes the factor isn't actually an enhancement but is rather a core part of the offense.  DOJ data from 2006 supports this supposition: in that year, 97% of child pornography defendants had used a computer. (See: http://bjs.ojp.usdoj.gov/content/pub/pdf/fpcseo06.pdf)

File-sharing networks (often called "peer to peer" or P2P) have become one of the most common means of accessing computer pornography.  Because of the ease and speed with which voluminous files can been shared and the way most file-sharing networks operate, a member of a file-sharing network can, simply by joining a group, easily and readily obtain files or images that he neither desired nor realized he received.  The member need not view each file contained in the bulk he received by joining the group, but each file still remains in the possession of that member.

Notice of Review of PSR
and Sentencing Memorandum

The top quantity enhancement of 600 images is easily reached in most cases.  This quantity is reached by simply possessing eight videos, which are counted as 75 images each.  Even where child pornography is sought, the requesting recipient has very little control over the quantity of images or the specific content. In the mass of files received there is frequently a file or multiple files that trigger the four level "S&M" or violence enhancement.

Almost all groups of child pornography include pre-pubescent images.  A P2P file-share can rapidly transfer hundreds or even thousands of images to a member who was not intending receipt of anything close to that volume.  The guidelines' maximum quantity enhancement–5 levels–is reached at 600 images, after just a single P2P session. (2G2.2(b)(7)(D)).  Quantity enhancements begin at just 10 images. (2G2.2(b)(7)(A)).  Cases with less than hundreds of images are rarely before the court.  Similarly, the 4-level enhancement for sadistic or masochistic or other depictions of violence, 2G2.2(b)(4), requires only one image that meets the definition, even in cases of hundreds or thousands of images.  The P2P possessor has no way of filtering out the more offensive "pre-pubescent" or violent images from less offensive yet still "baseline" illegal images.  Hence a P2P user can, in a single sitting, jump from a "simple possession" base of 18 (+ 2 for computer use, i.e. 20), to 31 (base, +2 for computer, +2 for pre–pubescent, +4 for S&M, +5 for over 600 images, *an increase of 11 levels*, when the conduct – clicking a button – brings that increase without any special or individualized conduct by the defendant.  By way of comparison, a level 17 (20 - 3 for acceptance), compared to a level 28 (31 - 3 for

Notice of Review of PSR
and Sentencing Memorandum

13

acceptance) at a history I is the difference between 24-30 months and 78-97 months.

The advisory guidelines are "the starting point and the initial benchmark" in determining a sentence. *Gall*, 128 S.Ct. At 596. At sentencing, the district court should first calculate the appropriate advisory guideline range and then decide whether to impose a sentence within the range or outside it.  Here, the initial guideline calculation is not worth deference, based upon the political manner in which the applicable guidelines have been reached, as opposed to the careful study of empirical evidence typically employed by the Sentencing Commission.  Rather, the more appropriate basis for sentencing are the section 3553(a) factors, as discussed herein.


**C.      Treatment will provide an effective means of preventing recidivism**

Possession of child pornography involves neither actual contact with children nor any further dissemination or promotion of the material.  A societal fear exists that those who view child pornography will quick and inevitable descent from possession to contact offenses. Yet the empirical data of precisely the type upon which it is the Commission's mandate and practice to rely shows otherwise.  There is "accumulating evidence" not only that paraphilia diagnoses, including pedophilia, ***do not predict any type of recidivism***, but that "there is ***no empirical support*** for a direct causal link between internet sex offending and the commission of contact offenses" (Kingston et. al., *Comparing Indicators of Sexual Sadism as Predictors of Recidivism among Adult Male Sexual Offenders*, J. Consulting and

Notice of Review of PSR
and Sentencing Memorandum

14

Clinical Psychology, Vol. 78, Issue 4, 574-584 (2010) (emphasis added); Webb et. al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse: J. Res. & Treatment 449, 451 (2007) (emphasis added)).

Studies examining the effectiveness of sex offender treatment in the 1990's produced mixed or inconsistent results, but systematic reviews conducted more recently indicate that certain sex offender treatment approaches can and do work. Specifically, cognitive-behavioral therapy and therapeutic communities have been shown to be effective in reducing recidivism.

In 1996, the GAO published a review of sex offender treatment research based on 22 other reviews covering 550 studies. Their analysis found no consensus among the reviews about what treatment works to reduce the recidivism of sex offenders. Cognitive-behavioral treatment was most often reported to be promising, while psychotherapy was generally viewed as not being effective. Because most of the reviews reported methodological problems, definitive conclusions about the efficacy of treatment could not be drawn.[4]

Gallagher et al. (1999) conducted a meta-analysis of 25 evaluations of sex offender treatment and found strong evidence that cognitive behavioral approaches with relapse prevention components are effective at reducing recidivism. Sex

---

[4] General Accounting Office. (June 1996). *Sex offender treatment: Research results inconclusive about what works to reduce recidivism.* GAO 96-137. Washington, DC.

Notice of Review of PSR
and Sentencing Memorandum

offenders treated with cognitive-behavioral/relapse prevention techniques recidivated at a rate 8 percentage points below that of comparison sex offenders. In 2002, Hanson and his colleagues conducted a meta-analysis of 43 studies and found that treatment reduced sexual recidivism by 4.5 percentage points.  A follow-up analysis based only on the more recent studies found a 7.5% reduction in sexual recidivism. Cognitive behavioral approaches again were most effective. Lösel and Schmucker's (2005) meta-analysis of 69 studies involving more than 22,000 offenders found a 6% reduction in recidivism among offenders who received treatment.[5]  Prentky et al. (2006) conducted a narrative review of treatment effectiveness studies and concluded that "the most reasonable estimate at this point is that treatment can reduce sexual recidivism over a five year period by between 5% and 8%."[6]  A meta-analysis of 30 studies conducted by Luong and Wormith (2006) found that sex offenders who received any treatment recidivated at a significantly lower rate than sex offenders who did not receive treatment. The researchers reported that for every 100 untreated sex offenders who sexually recidivate, 82 sex

---

[5]      Lösel, F., and Schmucker, M. (2005). The effectiveness of treatment for sexual offenders: A comprehensive meta-analysis. *Journal of Experimental Criminology, 1,* 117-146.

[6]      Prentky, R., Schwartz, B. and Burns-Smith, G. (2006). Treatment of Adult Sex Offenders. Applied Research Forum, National Online Resource Center on Violence Against Women. Page 5. Available at www.vawnet.org.

Notice of Review of PSR
and Sentencing Memorandum

1    offenders who received any form of treatment will do so.[7]  Again, cognitive-

2    behavioral approaches were associated with significant reductions in recidivism

3    whereas other treatment approaches were not.

4        Another study (Barnoski, 2006) examined the effectiveness of Washington's

5    Specialized Sex Offender Sentencing Alternative (SSOSA).  Under SSOSA, certain

6    felony sex offenders are granted in lieu of imprisonment a special sentence that

7    involves some jail time, community supervision and outpatient treatment.[8]  The

8    evaluation found that the five-year sexual and violent crime recidivism rates for

9    offenders granted a SSOSA were consistently lower than the rates for the other types

10   of sex offenders.  Another group conducted a meta-analysis of six rigorous studies of

11   adult sex offender treatment with aftercare and found that these programs reduced

12   recidivism, on average, by 7%.[9]

13       Studies demonstrate that treatment works.  In 2003, the Colorado Division of

14   Criminal Justice conducted an evaluation of the sex offender therapeutic community

15

16       [7]    Luong and Wormith (N.D.). Page 1.

17       [8]    Barnoski, R. (January, 2006). Sex offender sentencing in Washington

18   State: Special sex offender sentencing alternative trends.  Washington State

19   Institute for Public Policy, Olympia, WA.

20       [9]    Aos, S., Miller, M. and Drake, E. (2006). *Evidence-based adult*

21   *corrections programs: What works and what does not.*  Washington State Institute

22   for Public Policy, Olympia, WA.

23

24   Notice of Review of PSR
     and Sentencing Memorandum

17

at the Colorado Department of Corrections (DOC) (Lowden, et al., 2003).  The following key findings emerged from the study:

    • Participation in treatment was significantly associated with success on parole. An analysis of the parole completion/revocation rates of 1,585 sex offenders released to parole between 1993 and 2002 indicated that nearly half of the offenders who did not receive treatment were revoked back to prison. This rate was three times higher than the group that received both Phase I and Phase II treatment and two times higher than the group that only received Phase I treatment.

    • The length of time that an offender participates in treatment was significantly related to positive outcomes after release from prison. Each additional month spent in the TC increased the likelihood of success upon release by 1% (12% per year).

    • Sex offenders who did NOT have treatment and who were released on parole were at least eight times as likely to get arrested for a violent crime during the first year out than those who participated in TC treatment.

    • The Colorado DOC's program for sex offenders, as it was implemented in 2003, was found to effectively reduce recidivism.

    The lesson learned from reviewing the literature in this area of study is that sex offender treatment can and does have significant positive effects.  Treatment significantly lessens the risk of recidivism.  A well-structured treatment program can have significant and long-lasting effects on its participating patients.

Notice of Review of PSR
and Sentencing Memorandum

**D.     A Guideline Sentence in this case will create disparity as the Guidelines are recognized as flawed nationwide**

Child pornography has been an understandable concern since at least the passage of the Protection of Children from Exploitation Act of 1977.  (U.S. Sentencing Commission, History of Child Pornography Guidelines, 2009) Eradication of and punishment for child pornography remains necessary and legitimate congressional and societal focus. The guidelines applicable to possession of child pornography have been revised ten times since the promulgation of the first set of guidelines in1987.  While some revisions have been a response to the changing nature of visual medium and technology (i.e., the increased–and now almost totally exclusive–use of computers as opposed to paper or video material), most of the changes (increases to the offense level) have been based upon–indeed, required by–congressional mandates rather than sound empirical research and data. The Commission's "characteristic institutional role" has been repeatedly superceded by Congress, putting at odds the application of the advisory guidelines while also meeting the "sufficient but not greater than necessary" approach of the sentencing statute.

Throughout the history of the child pornography guidelines, the Commission has diligently gathered empirical data on the subject.  Congress has repeatedly applied a political response that ignores the Commission's empirical data.  Congress has required the Commission to implement changes in direct contradiction to the Commission's recommendations.  In 1991 and 1996, the Commission expressly objected by letter and report (respectively) to what it considered Congress's

Notice of Review of PSR
and Sentencing Memorandum

unreasonable and ill-considered directives to increase sentences for child

pornography.  In what was widely considered a rebuke for having stood its ground,

Congress in 2003 denied the Commission the opportunity even to offer objections

and instead congressionally enhanced the child pornography guidelines without any

notice to or consultation with the Commission.

The § 2G2.2 sentencing enhancements cobbled together through this process

routinely result in Guidelines projections near or exceeding the statutory maximum,

even in run-of-the-mill cases.  The base offense level for distribution of child

pornography, which in 1991 was 13, has been gradually increased to 22 as the

Commission has attempted to square the Guidelines with Congress's various

directives. *See* United States Sentencing Commission, *The History of the Child

Pornography Guidelines*, *supra*, at 19.  On top of that, many of the § 2G2.2

enhancements apply in nearly all cases.  Of all sentences under § 2G2.2 in 2009,

94.8% involved an image of a prepubescent minor (qualifying for a two-level

increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer (qualifying for a

two-level increase pursuant to § 2G2.2(b)(6)), 73.4% involved an image depicting

sadistic or masochistic conduct or other forms of violence (qualifying for a four-

level enhancement pursuant to § 2G2.2(b)(4)), and 63.1% involved 600 or more

images (qualifying for a five-level enhancement pursuant to § 2G2.2(b)(7)(D)).  *See*

United States Sentencing Commission, *Use of Guidelines and Specific Offense

Characteristics for Fiscal Year 2009*, available at

Notice of Review of PSR
and Sentencing Memorandum

20

http://www.ussc.gov/gl_freq/09_glinexgline.pdf.[10]  An ordinary first-time offender is

therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly

approaching the statutory maximum, based solely on sentencing enhancements that

are all but inherent to the crime of conviction (without accounting for acceptance of

responsibility.

Courts across the country have come to the conclusion that § 2G2.2 is "a

provision that...is seriously flawed and accordingly entitled to little respect." *United*

*States v. Donaghy*, 2010 WL 2605375 (E.D.Wis. 2010), collecting many such cases;

*see also United States v. Burns*, 2009 WL 3617448 (N.D. Ill. 2009); *United States v.*

*Dorvee*, 604 F.3d 84, (2nd Cir. 2010) (both pointing out the many flaws in advisory

guideline § 2G2.2 and the lack of empirical data which distinguish this guideline

from others promulgated by the Commission.)  Because the Guidelines do not

distinguish between these "run-of-the-mill" offenders and the most dangerous

offenders, the "result is fundamentally incompatible with § 3553(a)." *Dorvee* at 186.

See also, *United States v. Grober*, 2010 U.S. App. LEXIS 21980, (3rd Cir. 2010)

(citing *Dorvee* with approval and listing district court cases from around the country

---

[10]     While this number may seem high, the large  number of images

possessed by individuals convicted of child pornography likely stems from the fact

that the Guidelines count each video as 75 images. *See* Application Note 4,

U.S.S.G. § 2G2.2. It is also worth noting that 96.6% of defendants received at least

a two-level enhancement based on the number of images possessed.

Notice of Review of PSR
and Sentencing Memorandum

1   rejecting the advice of guideline 2G2.2).

2        The United States Sentencing Commission conducted a survey of United

3   States District Judges in 2010.  (*See* Exh. A).  The results of that survey are striking.

4   For distribution cases (which had the same mandatory minimum sentence Mr.

5   Tejeda faced initially on Count 1), the majority of judges surveyed (57%), found that

6   the mandatory minimum sentence of five years was appropriate for those convicted

7   of that offense.  (Exh. A at Question 1).  A significant minority (37%) found that

8   mandatory minimum sentence to be *too high*.  (Exh. A at Question 1).  A total of

9   94% of judges thus found the mandatory minimum to be appropriate or too high.

10  Only 6% of judges found it too low.  (Exh. A at Question 1).

11       When asked, 44% of judges either strongly or somewhat agreed that the safety

12  valve exception should be expanded to apply to distribution of child pornography

13  offenses.  (Exh. A. at Question 2).  15% were neutral, with a minority of 41% either

14  somewhat or strongly disagreeing with expanding the safety valve exception.  (Exh.

15  A at Question 2).  30% of judges found the guideline ranges for distribution to be

16  too high (Exh. A at Question 8).  35% of judges felt that distribution defendants

17  should be eligible for straight probation, probation with community or home

18  confinement, or split sentencing of imprisonment and community or home

19  confinement.  (Exh. A at Question 11).  Perhaps most importantly, 33% of judges

20  stated that statutory mandatory minimums were the leading factor in creating

21  sentencing disparities.  (Exh. A at Question 16).

22       Based on this survey (Exh. A), it is clear that on a nationwide basis, the child

23

24  Notice of Review of PSR
    and Sentencing Memorandum

pornography mandatory minimum and guidelines are recognized by many, if not most, judges as a significant sentencing problem.  Certainly, if the mandatory minimum is sufficient or even too severe, a guideline range which exceeds the mandatory minimum is greater than necessary.

Adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Mr. Tejeda, and the sentences for the more aggravated offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories.  This result is fundamentally incompatible with § 3553(a).  By concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and violates the principle, reinforced in *Gall,* that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct.  *See Gall,* 552 U.S. at 55 (affirming a sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated" (emphasis in original)).

The irrationality in § 2G2.2 is easily illustrated by a simple example.  Had Mr. Tejeda actually engaged in abusive sexual contact with a minor under the age of twelve, his applicable Guidelines range could have been identical or less, pursuant to U.S.S.G. § 2A3.4.  This illogical result demonstrates that the guideline range called

Notice of Review of PSR
and Sentencing Memorandum

for in this case is too high.

### E.    Collateral Consequences for a Registered Sex Offender render a Guidelines range sentence greater than necessary

The Court may also consider, both for purposes of public safety and in considering an appropriate sentence, the significant collateral consequences of a sex offense conviction. Regardless of the length of Mr. Tejeda's sentence, he will re-enter society forever branded with a label unique among convicted felons, a "sex offender," required by both state and federal law to register. It is, of course, Mr. Tejeda's own behavior that has put him in this position, and he accepts that fact. But it is undeniable that life as a registered sex offender (a registration that makes no distinction beyond length of registration between Mr. Tejeda who looked at images on a computer, and those who created the images or those who actually molest children) is measurably more compromised than life after a conviction for any other type of offense.

Sex offender registration is the scarlet letter of contemporary society. Housing, already a struggle for any other type of convicted felon, can prove "difficult, if not impossible," for registered sex offenders, who are often forced upon the mercy of their families or social services. Employment is hard to find, especially for those sex offenders who, like Mr. Tejeda and do not have a specialized trade or vocational. The supervision limitations on computer use and internet access further limit employment opportunities. The social stigma of registration all but ensures a lonely, isolated existence shrouded in shame.

Notice of Review of PSR
and Sentencing Memorandum

24

1   The fact is that Mr. Tejeda, upon completing the incarcerative portion of his

2   sentence, will only have begun to taste the extent of his punishment. As a member of

3   that subset of defendants already subject to an excessive mandatory minimum and

4   guideline range, he will on top of his sentence face a lifetime of distinct collateral

5   consequences.

6

7   **III.    Conclusion**

8       As discussed herein, the applicable guidelines are fundamentally flawed and

9   not worthy of any deference whatsoever.  A sentence of 48 months, pursuant to the

10  plea agreement, is sufficient but not greater than necessary.

11      Based on the availability and effectiveness of treatment, and the other

12  collateral consequences, as discussed herein, Mr. Tejeda requests the Court sentence

13  him to the mandatory minimum term of supervised release, which is five years.

14  Dated:       July 15, 2014

15

16                                                  Respectfully Submitted,

17

18                                                  *s/ Matthew Campbell*
                                                    Matthew Campbell, WA 38696
                                                    Federal Defenders of
19                                                  Eastern Washington and Idaho
                                                    10 North Post, Suite 700
20                                                  Spokane, Washington 99201
                                                    Telephone: (509) 624-7606
21                                                  Fax: (509) 747-3539
                                                    Email:  Matt_Campbell@fd.org

22

23

24  Notice of Review of PSR
    and Sentencing Memorandum

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on July 15, 2014, I electronically filed the foregoing with

3 the Clerk of the Court using the CM/ECF System which will send notification of

4 such filing to the following: STEPHANIE LISTER, Assistant United States

5 Attorney.

6

7                                         *s/ Matthew Campbell*

8                                 Matthew Campbell, WA 38696
                                Federal Defenders of
                                Eastern Washington and Idaho
9                               10 North Post, Suite 700
                                Spokane, Washington 99201
10                              Telephone: (509) 624-7606
                                Fax: (509) 747-3539
11                              Email:  Matt_Campbell@fd.org

12

13

14

15

16

17

18

19

20

21

22

23

24  Notice of Review of PSR
    and Sentencing Memorandum

1

2

3

4

5

6

7

8

9

10

11

# EXHIBIT A

12

13

14

15

16

17

18

19

20

21

22

23

24

Notice of Review of PSR
and Sentencing Memorandum

# Results of Survey of United States District Judges January 2010 through March 2010



UNITED STATES SENTENCING COMMISSION

June 2010

# Results of Survey of
# United States District Judges
# January 2010 through March 2010



**William K. Sessions III**
*Chair*

**Ruben Castillo**
*Vice Chair*

**William B. Carr, Jr.**
*Vice Chair*

**Ketanji Brown Jackson**
*Vice Chair*

**Ricardo H. Hinojosa**
*Commissioner*

**Beryl A. Howell**
*Commissioner*

**Dabney L. Friedrich**
*Commissioner*

**Isaac Fulwood, Jr.**
*(ex officio)*

**Jonathan J. Wroblewski**
*(ex officio)*

**Results of Survey of United States District Judges**
**January 2010 through March 2010**

**Introduction**

The Sentencing Reform Act of 1984[1] significantly changed the manner in which offenders convicted of federal crimes are punished by eliminating the system of indeterminate sentencing then in use, including the use of parole, and instituting in its place a system of determinate sentencing. Through the SRA, Congress created the United States Sentencing Commission as an independent agency in the judicial branch of government.

The SRA provided that the principal purposes of the Commission are to —

(1) establish sentencing policies and practices for the federal criminal justice system that —

- incorporate the purposes of sentencing (*i.e.*, just punishment, deterrence, incapacitation, and rehabilitation);

- provide certainty and fairness in meeting the purposes of sentencing by avoiding unwarranted disparity among offenders with similar criminal characteristics convicted of similar criminal conduct, while permitting sufficient judicial flexibility to take into account relevant aggravating and mitigating factors; and

- reflect, to the extent practicable, advancement in the knowledge of human behavior as it relates to the criminal justice process; and

(2) develop the means of measuring the degree to which sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing.[2]

The Commission accomplishes the first purpose principally through the promulgation of federal sentencing guidelines, informed in that effort by its ongoing research and data analysis activities. The Commission's research and data collection, and its dissemination of the results of that activity, also contribute significantly to accomplishing the second purpose.

In providing the authority by which the Commission could accomplish these purposes, Congress also authorized the Commission to collect and disseminate information regarding the effectiveness of sentences imposed; assist and serve in a consulting capacity to the federal courts, departments, and agencies in the development, maintenance, and coordination of sound sentencing practices; and make recommendations to Congress concerning modification or enactment of statutes relating to sentencing, penal, and correctional matters.[3]

---

[1]  Sentencing Reform Act of 1984, Pub. L. No. 98–473, 98 Stat. 2019 (1987) (hereinafter SRA).

[2]  28 U.S.C. § 991(b).

[3]  *See* 28 U.S.C. § 995(a)(12), (16), (20).

1

To mark the 25th anniversary of the SRA, the Commission sought information from a wide range of persons and groups with a role in the federal criminal justice system about sentencing practices in general and the federal sentencing guidelines in particular. The federal sentencing guidelines were in effect as a mandatory system for 16 years and have now been in effect as an advisory system for five years, which is sufficient time for federal judges to have assessed the merits and shortcomings of the advisory system.[4] Over a ten-month period, the Commission conducted a series of regional public hearings on federal sentencing practices and the guidelines. The Commission held seven hearings and received testimony from more than 135 witnesses. Among the witnesses were United States circuit and district judges, representatives of the United States Department of Justice, federal public defenders and other defense counsel, probation officers, researchers and other academics, law enforcement officials, and representatives of public interest and advocacy groups.

Although these hearings were extensive, the Commission sought to provide an opportunity to receive broader input on many of the issues raised at the hearings from as many district judges as possible, and to capture this input in a systematized and quantifiable way. To do this, the Commission undertook a survey of all United States district judges concerning their views and opinions on sentencing practices. The Commission contracted with Abt Associates, a professional research firm, and its affiliate, Abt SRBI, a professional survey firm (collectively "Abt"), to conduct the survey.[5] This is the first survey of federal judges to elicit their views about federal sentencing under an advisory guidelines system. On several prior occasions, the Commission has used surveys to canvass federal judges and others about their opinions on federal sentencing issues.[6]

The Commission's 2010 survey asked questions grouped into five broad areas: (1) statutory and structural sentencing issues; (2) sentencing hearings; (3) guideline application issues; (4) departures; and (5) general assessments. Judges were provided an opportunity to offer written comments in addition to or to expand upon their answers to the survey questions. A copy of the survey is attached to this report as Appendix A.

**How the Survey Was Conducted**

The Commission reviewed its prior surveys of federal judges and developed a series of draft questions for the 2010 survey. The draft questions were provided to Abt, which modified

---

[4] United States v. Booker, 543 U.S. 220 (2005).

[5] Abt was selected to conduct this survey after a competitive procurement process. The Commission decided to engage the services of a professional research and survey firm in order to draw upon the expertise of such a firm in survey research and design, as well as its ability to distribute, receive, and tabulate a large number of survey responses in a short period of time. By using an outside research organization for this purpose, the Commission was able to maintain the confidentiality of all survey participants yet also ensure that responses were received from a representative group of judges.

[6] LINDA DRAZGA MAXFIELD, UNITED STATES SENTENCING COMMISSION, FINAL REPORT: SURVEY OF ARTICLE III JUDGES ON THE FEDERAL SENTENCING GUIDELINES (2003); MOLLY TREADWAY JOHNSON & SCOTT A. GILBERT, FED. JUDICIAL CTR., THE U.S. SENTENCING GUIDELINES, RESULTS OF THE FEDERAL JUDICIAL CENTER'S 1996 SURVEY (1997); UNITED STATES SENTENCING COMMISSION, A NATIONAL SAMPLE SURVEY, PUBLIC OPINION ON SENTENCING FEDERAL CRIMES (1995).

the questions for a survey format and organized them into a structured questionnaire. On January 4, 2010, Abt sent an electronic mail to all district court judges inviting them to complete the questionnaire online and providing an Internet link to the questionnaire. On January 13, Abt sent a follow-up reminder invitation also by electronic mail. Abt sent a paper copy of the questionnaire to each judge who did not complete the survey online by January 20 and to any other judge who requested to receive the report in paper format, along with a cover letter from the chair of the Commission asking the judge to complete the survey. Judges who received the paper survey could complete it online or by mailing the paper questionnaire to Abt.

On February 17, Abt mailed another paper copy of the survey and the cover letter to those judges who had not completed the survey in either format. Also on February 17, Abt sent an additional reminder by electronic mail to judges who had not responded to the survey. Abt staff again made reminder telephone calls on February 23–24.

During the survey period, approximately 50 judges asked to be excluded from the survey because they were no longer active judges, had sentenced no criminal offenders in the last two years, or for other reasons. Those judges have been omitted from the data analysis presented in this report.

Judges submitted their survey responses directly to Abt, either through the website Abt created for the survey or by mailing the paper questionnaire directly to Abt. All responses were kept confidential. In order to further maintain confidentiality, Abt did not provide any information to the Commission as to which judges had or had not completed the survey but only the overall number of judges who responded. In its final report to the Commission about its work, Abt provided only aggregate data to the Commission as to the responses to the survey. No individual responses were provided apart from the written comments that some judges included in their survey response. Abt did not identify the names of the judges who made these comments.

**Response Rate to the Survey**

The survey period formally ended on March 1, 2010; however, all responses delivered to Abt by March 31, 2010, were included in its report to the Commission. Abt reported to the Commission that, of the 942 judges to whom the survey was sent and who did not ask to be excluded from the survey, 639 responded to Abt. This represents a 67.8 percent response rate to the survey.

The judges who responded to the survey presided over a significant portion of the cases in which federal offenders were sentenced during fiscal years 2008 and 2009. During this two-year period, district court judges imposed original sentences on 146,511 individual federal criminal offenders.[7] Based on an analysis performed by Abt, the 639 judges who responded to the survey sentenced 116,183, or 79 percent, of these offenders. Of the 50 judges who sentenced

---

[7] This number represents offenders convicted of felonies and Class A misdemeanors under federal law.

3

the most individual offenders during the two-year period from fiscal year 2008 to fiscal year 2009, the response rate was even higher. Of the judges in this group, 43 responded to the survey. This represents an 86 percent response rate by these judges. Together, these 43 judges account for 31 percent of all offenders sentenced nationally during that period.

By grouping all serving district court judges into four groups for analytical purposes by the number of offenders on whom each judge imposed sentence during the two-year period, Abt was able to determine whether the judges who are most experienced in criminal matters responded to the survey at a significant rate. Abt's analysis shows that, in fact, the more criminal cases a judge handled, the more likely he or she was to respond to the survey. For example, among the 25 percent of all judges who sentenced the most offenders during the two-year period, 80 percent responded to the survey, a rate higher than the overall response rate to the survey. The judges in this group account for 62 percent of all offenders sentenced during fiscal years 2008 and 2009. The response rate for judges in the middle two groups (half of all the judges) ranged from 67 to 69 percent. Together, the judges in these groups imposed sentence on 34 percent of all individual offenders sentenced during this period. The response rate among the judges in the last group of judges, the 25 percent of judges sentencing the fewest offenders during the two-year period, remained substantial, although lower, at 46 percent. The judges in this group imposed sentence on four percent of all offenders sentenced during the two-year period.

**Survey Results**

Below is a series of tables that set out the results of the Commission's survey of district court judges. These results present the answers given to the specific questions posed in the survey instrument.

4

# I. Statutory and Structural Issues

## Question 1.  Mandatory Minimums

**Table 1.  Was the mandatory minimum sentence generally appropriate for these offenses?**

|  | Appropriate | Too Low | Too High | Total | Number | N/A | Missing |
|---|---|---|---|---|---|---|---|
|  | Percent | | | | | | |
| All Offenses With A Mandatory Minimum | 38% | 0% | 62% | 100% | 513 | 65 | 61 |
| Drug Trafficking | | | | | | | |
| *Heroin* | 55 | 2 | 43 | 100% | 495 | 121 | 23 |
| *Powder Cocaine* | 52 | 4 | 44 | 100% | 585 | 32 | 22 |
| *Crack Cocaine* | 23 | 1 | 76 | 100% | 593 | 25 | 21 |
| *Methamphetamine* | 53 | 4 | 44 | 100% | 531 | 84 | 24 |
| *Marijuana* | 43 | 3 | 54 | 100% | 530 | 86 | 23 |
| Firearms Offenses | | | | | | | |
| *Under 18 USC § 924(c)* | 61 | 2 | 38 | 100% | 584 | 32 | 23 |
| *Under 18 USC § 924(e)* | 59 | 2 | 39 | 100% | 566 | 52 | 21 |
| Child Pornography | | | | | | | |
| *Production* | 67 | 10 | 23 | 100% | 510 | 113 | 16 |
| *Distribution* | 57 | 6 | 37 | 100% | 555 | 69 | 15 |
| *Receipt* | 26 | 2 | 71 | 100% | 585 | 40 | 14 |
| Other Child Exploitation Offenses | 68 | 6 | 26 | 100% | 420 | 195 | 24 |
| Aggravated Identity Theft | 54 | 18 | 27 | 100% | 487 | 130 | 22 |

Note.  *"Number" refers to respondents who answered question with other than a "N/A" response. "N/A," or "not applicable," means that respondent had not sentenced a defendant convicted post-<u>Kimbrough/Gall</u>.  "Missing" means that respondent did not provide any information about this question.  Percents may not sum to 100% due to rounding.*

# Question 2.  Safety Valve

**Table 2.  The statutory safety valve should be expanded to include:**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree | Total | Number | Missing |
|---|---|---|---|---|---|---|---|---|
| | | | Percent | | | | | |
| Drug trafficking offenders who have 2 or 3 criminal history points (*i.e.*, those in Criminal History Category II) | 30% | 36% | 12% | 14% | 8% | 100% | 630 | 9 |
| Drug trafficking offenders who have 4, 5, or 6 criminal history points (*i.e.*, those in Criminal History Category III) | 10 | 12 | 18 | 26 | 34 | 100% | 630 | 9 |
| All Offenses With a Mandatory Minimum | 40 | 29 | 13 | 10 | 8 | 100% | 625 | 14 |
| Drug Trafficking | 44 | 32 | 12 | 8 | 4 | 100% | 613 | 26 |
| Firearms Offenses | | | | | | | | |
| *Under 18 USC § 924(c)* | 31 | 28 | 15 | 16 | 10 | 100% | 615 | 24 |
| *Under 18 USC § 924(e)* | 30 | 27 | 16 | 15 | 12 | 100% | 615 | 24 |
| Child Pornography | | | | | | | | |
| *Production* | 20 | 14 | 16 | 20 | 31 | 100% | 618 | 21 |
| *Distribution* | 25 | 19 | 15 | 18 | 23 | 100% | 618 | 21 |
| *Receipt* | 43 | 28 | 13 | 7 | 8 | 100% | 618 | 21 |
| Other Child Exploitation Offenses | 19 | 15 | 28 | 15 | 23 | 100% | 608 | 31 |
| Aggravated Identity Theft | 23 | 23 | 26 | 15 | 13 | 100% | 617 | 21 |

Note.  *"Number" refers to respondents who answered question.  "Missing" means that respondent did not provide any information about this question.  Percents may not sum to 100% due to rounding.*

# Question 3. Which response best reflects your view of the following statements?

Table 3. Opinions about Possible Statutory Changes and Structural Changes to the Guidelines

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree | Total | Number | Missing |
|---|---|---|---|---|---|---|---|---|
| | | | Percent | | | | | |
| Congress should amend 28 USC § 994(b)(2) to allow broader ranges on the Sentencing Table. | 24% | 27% | 36% | 10% | 4% | 100% | 625 | 14 |
| The sentencing guidelines should be "de-linked" from statutory mandatory minimum sentences (i.e., the guideline ranges should be set by the Commission independently from mandatory minimum sentences). | 34 | 24 | 19 | 14 | 8 | 100% | 628 | 11 |
| The number of categories in the loss table in USSG §2B1.1 should be decreased by broadening the monetary ranges. | 14 | 23 | 37 | 19 | 6 | 100% | 626 | 13 |
| The number of drug quantity ranges in the Drug Quantity Table in USSG §2D1.1 should be decreased by broadening the quantity ranges. | 14 | 21 | 33 | 24 | 8 | 100% | 624 | 15 |
| The number of criminal history categories in the Sentencing Table should be decreased. | 4 | 6 | 24 | 42 | 25 | 100% | 627 | 12 |
| The number of offense levels in the Sentencing Table should be decreased. | 6 | 10 | 27 | 39 | 18 | 100% | 627 | 12 |
| Some of the more generic SOC adjustments (e.g., weapon use, victim injury) in Chapter Two of the Guidelines Manual should be moved to Chapter Three. | 3 | 12 | 77 | 5 | 3 | 100% | 621 | 18 |

Note. "Number" refers to respondents who answered question. "Missing" means that respondent did not provide any information about this question. Percents may not sum to 100% due to rounding.

## Question 4.  "Good Time"

**Table 4.  The maximum amount of good time credit allowable should be:**

|  | Percent | Number |
|---|---|---|
| Unchanged | 65 |  |
| Reduced | 3 |  |
| Increased | 31 |  |
| Total | 100 |  |
| Number |  | 625 |
| Missing |  | 14 |

Note.  *"Number" refers to respondents who answered question. "Missing" means that respondent did not provide any information about this question.*

# II. Sentencing Hearings

## Question 5.  Relevant Conduct

**Table 5.  What should be considered "relevant conduct" for purposes of sentencing?**

|  | Proportion of Respondents Indicating Agreement Percent | Number |
|---|---|---|
| All reasonably foreseeable acts and omissions of others in furtherance of a jointly undertaken criminal activity? | 79 | 639 |
| Conduct that was charged in a count that was later dismissed? | 31 | 639 |
| Uncharged conduct that is presented at trial or admitted by the defendant in court? | 77 | 639 |
| Uncharged conduct referenced only in the presentence report? | 32 | 639 |
| Acquitted conduct? | 16 | 639 |

# Question 6.  Standard of Proof

**Table 6.  What do you think should be the standard of proof for each type of fact to be established at sentencing?**

| | Preponderance | Clear and Convincing | Beyond a Reasonable Doubt | Total | Number | Missing |
|---|---|---|---|---|---|---|
| | | Percent | | | | |
| Facts establishing the base offense level | 69% | 14% | 17% | 100% | 630 | 9 |
| Facts supporting adjustments to the base offense level | 75 | 17 | 8 | 100% | 630 | 9 |
| Facts supporting departures | 85 | 13 | 2 | 100% | 631 | 8 |
| Facts supporting variances | 87 | 11 | 2 | 100% | 630 | 9 |

Note.  *"Number" refers to respondents who answered question.  "Missing" means that respondent did not provide any information about this question.  Percents may not sum to 100% due to rounding.*

## Question 7.  Crime Victims

**Table 7.  Which response best reflects your view of the following statements?**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree | Total | Number | Missing |
|---|---|---|---|---|---|---|---|---|
| | | | Percent | | | | | |
| The interests of crime victims generally are adequately protected under current federal sentencing procedures. | 34% | 45% | 9% | 10% | 2% | 100% | 626 | 13 |
| Presentence reports should be required to include information a victim wishes to be included in the report. | 19 | 35 | 16 | 17 | 13 | 100% | 630 | 9 |
| Portions of presentence reports, including descriptions of the offense conduct and guideline calculations, should be disclosed to victims. | 9 | 26 | 20 | 24 | 22 | 100% | 631 | 8 |
| Victims should have the opportunity to comment on the presentence report, including on disputed guidelines factors, before the sentence is imposed. | 5 | 17 | 10 | 31 | 37 | 100% | 630 | 9 |
| Congress should amend the restitution statutes to more broadly define the term "victim" to include persons who suffer any harm, injury, or loss that would have not occurred but for the defendant's crime. | 10 | 36 | 20 | 21 | 13 | 100% | 630 | 9 |
| Congress should amend the restitution statutes to more broadly provide for compensation to victims, including for emotional distress or other consequential harm or loss that the victim suffered as a result of the defendant's crime. | 7 | 23 | 18 | 27 | 24 | 100% | 628 | 11 |
| Courts should have the authority to order restitution to victims in all cases. | 26 | 40 | 20 | 7 | 7 | 100% | 627 | 12 |

Note.  "Number" refers to respondents who answered question.  "Missing" means that respondent did not provide any information about this question.  Percents may not sum to 100% due to rounding.

# III. Guideline Application

## Question 8.  Appropriateness of Guideline Ranges

**Table 8.  Is the guideline range generally appropriate for each following type of offense?**

|  | Yes | No—Too Low | No—Too High | Total | Number | N/A | Missing |
|---|---|---|---|---|---|---|---|
|  |  | Percent |  |  |  |  |  |
| Murder | 89% | 9% | 2% | 100% | 143 | 474 | 22 |
| Manslaughter | 78 | 21 | 1 | 100% | 107 | 504 | 28 |
| Assault | 83 | 12 | 5 | 100% | 282 | 330 | 27 |
| Fraud | 65 | 24 | 10 | 100% | 594 | 20 | 25 |
| Larceny/Theft/Embezzlement | 70 | 21 | 9 | 100% | 570 | 47 | 22 |
| Drug Trafficking |  |  |  |  |  |  |  |
| Heroin | 65 | 3 | 32 | 100% | 475 | 150 | 14 |
| Powder Cocaine | 65 | 6 | 30 | 100% | 599 | 26 | 14 |
| Crack Cocaine | 28 | 2 | 70 | 100% | 592 | 34 | 13 |
| Methamphetamine | 60 | 6 | 34 | 100% | 539 | 84 | 16 |
| Marijuana | 54 | 5 | 41 | 100% | 553 | 72 | 14 |
| Ecstasy | 65 | 4 | 30 | 100% | 430 | 193 | 16 |
| Oxycodone | 64 | 6 | 29 | 100% | 384 | 235 | 20 |
| Child Pornography |  |  |  |  |  |  |  |
| Production | 72 | 13 | 16 | 100% | 450 | 173 | 16 |
| Distribution | 62 | 8 | 30 | 100% | 530 | 93 | 16 |
| Receipt | 28 | 3 | 69 | 100% | 570 | 72 | 14 |
| Possession | 26 | 3 | 70 | 100% | 576 | 46 | 17 |
| Other Child Exploitation Offenses | 72 | 12 | 16 | 100% | 348 | 258 | 33 |
| Firearms | 70 | 7 | 23 | 100% | 591 | 29 | 19 |
| Alien Smuggling | 67 | 21 | 12 | 100% | 395 | 225 | 19 |
| Illegal Reentry into the U.S. | 55 | 11 | 34 | 100% | 592 | 32 | 15 |

Note.  *"Number" refers to respondents who answered question with other than a "N/A response." "N/A", or "not applicable," means that respondent had not sentenced a defendant convicted post-Kimbrough/Gall.  "Missing" means that respondent did not provide any information about this question.  Percents may not sum to 100% due to rounding.*

# Question 9.  Role in the Offense

**Table 9.  Which answer best reflects your view of the following statements?**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree | Total | Number | Missing |
|---|---|---|---|---|---|---|---|---|
| | | | Percent | | | | | |
| The distinction between a "minor" and "minimal" participant should be explained more clearly. | 31% | 35% | 23% | 9% | 2% | 100% | 624 | 15 |
| The distinction between an "organizer/leader" and a "manager/supervisor" should be explained more clearly. | 28 | 38 | 23 | 8 | 2 | 100% | 625 | 14 |
| The range of adjustments based on role in the offense should be increased (*i.e.*, allow adjustments for role in the offense greater than 4 levels). | 15 | 32 | 28 | 19 | 6 | 100% | 623 | 16 |

Note. *"Number" refers to respondents who answered question.  "Missing" means that respondent did not provide any information about this question.  Percents may not sum to 100% due to rounding.*

# Question 10. Criminal History Calculation

**Table 10. Which response best reflects your view of the following statements?**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree | Total | Number | Missing |
|---|---|---|---|---|---|---|---|---|
| | | | Percent | | | | | |
| The combined impact of "recency" points and "status" points under USSG §4A1.1(d) and (e) should be reduced. | 9% | 19% | 55% | 12% | 5% | 100% | 619 | 20 |
| Misdemeanor careless or reckless driving should always be excluded from criminal history computations. | 17 | 25 | 19 | 30 | 8 | 100% | 627 | 12 |
| Misdemeanor driving without a license or with a revoked or suspended license should always be excluded from criminal history computations. | 17 | 28 | 16 | 29 | 9 | 100% | 627 | 12 |
| Misdemeanor insufficient funds check should always be excluded from criminal history computations. | 16 | 23 | 22 | 33 | 6 | 100% | 629 | 10 |
| Misdemeanor disorderly conduct or disturbing the peace should always be excluded from criminal history computations. | 11 | 19 | 21 | 40 | 8 | 100% | 627 | 12 |
| Misdemeanor loitering offenses should always be excluded from criminal history computations. | 25 | 30 | 19 | 22 | 4 | 100% | 628 | 11 |
| Misdemeanor public intoxication offenses should always be excluded from criminal history computations. | 19 | 29 | 19 | 27 | 6 | 100% | 628 | 11 |
| Offenses committed prior to age 18 should always be excluded from criminal history computations. | 10 | 18 | 13 | 39 | 21 | 100% | 628 | 11 |
| Sentences resulting from tribal court convictions should be included in criminal history computations. | 12 | 24 | 45 | 10 | 9 | 100% | 623 | 16 |
| The applicable time periods for counting prior offenses under USSG §4A1.2(e) (i.e., the "decay factor") should be shortened. | 4 | 15 | 31 | 32 | 18 | 100% | 627 | 12 |
| The career offender provisions at USSG §§4B1.1 and 4B1.2 should be amended to apply only to offenders described in 28 USC § 994(h). | 9 | 22 | 43 | 18 | 9 | 100% | 624 | 15 |

Note. ''Number'' refers to respondents who answered question. ''Missing'' means that respondent did not provide any information about this question. Percents may not sum to 100% due to rounding.

# Question 11.  Availability of Sentence Types

Table 11.  Do you believe the following sentences should be made *more available for each* offense?

| | Straight Probation | Probation with Community or Home Confinement | Split Sentencing of Imprisonment and Community or Home Confinement | Number |
|---|---|---|---|---|
| | Percent of Judges Answering Affirmatively | | | |
| | 1% | 1% | 5% | 639 |
| Murder | 1% | 1% | 5% | 639 |
| Manslaughter | 2 | 3 | 17 | 639 |
| Assault | 8 | 12 | 33 | 639 |
| Fraud | 14 | 22 | 43 | 639 |
| Larceny/Theft/Embezzlement | 15 | 24 | 44 | 639 |
| Drug Trafficking | | | | |
| *Heroin* | 8 | 11 | 28 | 639 |
| *Powder Cocaine* | 9 | 14 | 33 | 639 |
| *Crack Cocaine* | 9 | 13 | 34 | 639 |
| *Methamphetamine* | 9 | 13 | 32 | 639 |
| *Marijuana* | 19 | 22 | 40 | 639 |
| *Ecstasy* | 11 | 15 | 32 | 639 |
| *Oxycodone* | 10 | 14 | 32 | 639 |
| Child Pornography | | | | |
| *Production* | 4 | 5 | 17 | 639 |
| *Distribution* | 5 | 8 | 22 | 639 |
| *Receipt* | 15 | 20 | 39 | 639 |
| *Possession* | 19 | 23 | 41 | 639 |
| Other Child Exploitation Offenses | 6 | 7 | 18 | 639 |
| Firearms | 3 | 11 | 33 | 639 |
| Alien Smuggling | 6 | 9 | 22 | 639 |
| Illegal Reentry into the U.S. | 14 | 11 | 21 | 639 |

Note.   *"Number" refers to respondents who answered question.*

43

# Question 12. Supervised Release

**Table 12a. Which response best reflects your view of the following statements?**

| | Appropriate | Too Low | Too High | Total | Number | Missing |
|---|---|---|---|---|---|---|
| | | Percent | | | | |
| The number of cases in which the guidelines provide for supervised release generally is: | 87% | 7% | 7% | 100% | 628 | 11 |
| The lengths of the terms of supervised release terms provided by the guidelines generally are: | 87 | 7 | 6 | 100% | 631 | 8 |
| The ranges of punishment for violations of supervised release provided by the policy statements in Chapter Seven, Part B of the *Guidelines Manual* generally are: | 77 | 16 | 7 | 100% | 629 | 10 |

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree | Total | Number | Missing |
|---|---|---|---|---|---|---|---|---|
| | | | Percent | | | | | |
| The minimum terms of supervised release provided in USSG §5D1.2 should be eliminated. | 10% | 21% | 35% | 22% | 13% | 100% | 624 | 15 |

Note. *"Number" refers to respondents who answered question. "Missing" means that respondent did not provide any information about this question. Percents may not sum to 100% due to rounding.*

# IV. Departures and Variances
# Question 13.  Factors to Consider at Sentencing

Table 13. Relevance of various characteristics at sentencing.

| | Is Ordinarily Relevant to Within-Range Determination | Is Ordinarily Relevant to Departure and/or Variance Consideration | Never Relevant | Number |
|---|---|---|---|---|
| | Percent of Judges Responding Affirmatively | | | |
| Age | 57% | 67% | 0% | 639 |
| Education | 46 | 48 | 5 | 639 |
| Vocational Skills | 41 | 41 | 6 | 639 |
| Mental Condition | 65 | 79 | 0 | 639 |
| Emotional Condition | 51 | 60 | 3 | 639 |
| Physical Condition | 51 | 64 | 1 | 639 |
| Drug Dependence | 50 | 49 | 5 | 639 |
| Alcohol Dependence | 48 | 47 | 5 | 639 |
| Gambling Addiction | 38 | 39 | 10 | 639 |
| Employment Record | 62 | 65 | 2 | 639 |
| Family Ties and Responsibilities | 57 | 62 | 2 | 639 |
| Community Ties | 46 | 49 | 5 | 639 |
| Dependence on Criminal Livelihood | 56 | 55 | 12 | 639 |
| Stress Related to Military Service | 48 | 64 | 4 | 225* |
| Civic, Charitable, or Public Service | 52 | 60 | 2 | 639 |
| Employment-Related Contributions | 43 | 47 | 9 | 639 |
| Prior Good Works | 55 | 62 | 3 | 639 |
| Lack of Guidance as a Youth | 49 | 49 | 7 | 639 |
| Disadvantaged Upbringing | 48 | 50 | 7 | 639 |
| Diminished Capacity | 66 | 80 | 0 | 639 |
| Voluntary Disclosure of Offense | 70 | 74 | 0 | 639 |
| Post-Sentencing Rehabilitative Efforts | 51 | 57 | 6 | 639 |
| Post-Offense Rehabilitative Efforts | 61 | 70 | 1 | 639 |
| Aberrant Behavior | 64 | 74 | 1 | 639 |
| Exceptional Efforts to Fulfill Restitution Obligations | 62 | 75 | 1 | 639 |
| Undue Influence Related to Affection, Relationship, or Fear of Other Offender(s) | 57 | 68 | 3 | 639 |

Note.  *Data for "stress related to military service" was collected from judges who responded on paper questionnaires and was erroneously omitted from the online survey. "Number" refers to respondents who answered question.  Percents do not sum to 100% because many judges responded affirmatively to more than one condition.

45

# Question 14. Departure Provisions

## Table 14. Which response best reflects your view of the following reasons for not relying on departure provisions?

| | Percent | Number | Missing |
|---|---|---|---|
| Not applicable/no such cases in past two years | 13% | 637 | 2 |
| The *Guidelines Manual* does not contain a departure provision that adequately reflects the reason for the sentence outside the guideline range. | 76 | 556 | 0 |
| Departure policy statements in the *Guidelines Manual* were too restrictive. | 65 | 556 | 0 |
| Circuit case law regarding departures was too restrictive. | 35 | 556 | 0 |
| Departure policy statements are inconsistent with the factors under 18 USC § 3553(a). | 41 | 556 | 0 |
| Departures are subject to heightened procedural requirements (*e.g.*, notice requirements under Fed. R. Crim. P. 32(h)). | 28 | 556 | 0 |
| Departures are subject to stricter appellate review than variances. | 38 | 556 | 0 |

Note. *"Number" refers to respondents who indicated their agreement to any of the statements. "Percent" refers to the proportion of that number who indicated their agreement to the corresponding statement. "Missing" refers to respondents who provided no opinion about any of the statements in question 14. Thirteen percent (or 81) of the 637 non-missing judges indicated that this question was not applicable because they had no such cases during past two years. These 81 judges were therefore excluded from the sample for the remaining statements, leaving 556 judges. Because judges were asked to check any statement that they agreed with, percents sum to more than 100%.*

# Question 15.  Substantial Assistance

**Table 15. For each statement, which response best reflects your view?**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree | Total | Number | Missing |
|---|---|---|---|---|---|---|---|---|
| | | | Percent | | | | | |
| Congress should amend 18 USC § 3553(e) to authorize judges to sentence a defendant below the applicable statutory mandatory minimum to reflect a defendant's substantial assistance, even if the government does not make a motion. | 25% | 29% | 11% | 18% | 17% | 100% | 633 | 6 |
| The Commission should amend USSG §5K1.1 to authorize judges to sentence below the applicable guideline range to reflect a defendant's substantial assistance, even if the government does not make a motion. | 25 | 29 | 12 | 18 | 17 | 100% | 632 | 7 |
| The Federal Rules of Criminal Procedure should be amended to authorize judges to reduce a defendant's sentence under Rule 35(b) if the defendant, after sentencing, provides the required assistance, even if the government does not make a motion. | 22 | 26 | 15 | 21 | 17 | 100% | 633 | 6 |
| The Commission should amend USSG §5K1.1 to provide additional guidance regarding the extent to which a court may depart under that provision (i.e., provide specific guidance on the number of offense levels recommended for departures based on the factors enumerated in USSG §5K1.1). | 14 | 28 | 20 | 20 | 19 | 100% | 630 | 9 |
| The Commission should amend USSG §5K1.1 to provide additional guidance regarding evaluation of the nature and extent of the assistance provided. | 15 | 30 | 22 | 18 | 15 | 100% | 632 | 7 |
| The Commission should amend USSG §5K1.1 to provide additional guidance regarding evaluation of the results obtained through the assistance provided. | 15 | 27 | 23 | 20 | 16 | 100% | 632 | 7 |
| In determining the extent of a reduction below the statutory mandatory minimum under 18 USC § 3553(e) or Fed. R. Crim. P. 35(b), the court's consideration should not be limited to the nature of the defendant's substantial assistance but also should include consideration of the factors at 18 USC § 3553(a). | 33 | 30 | 14 | 13 | 11 | 100% | 631 | 8 |

Note.  "Number" refers to respondents who answered question.  "Missing" means that respondent did not provide any information about this question.  Percents may not sum to 100% due to rounding.

# V. General Assessment

## Question 16. Sentencing Disparities

Table 16. Ranking of factors thought to contribute to disparities.

| | Percent of Respondents | | | | | Number | Missing |
|---|---|---|---|---|---|---|---|
| | **1** | **2** | **3** | **4** | **5** | | |
| Statutory Mandatory Minimums | 33% | 12% | 7% | 6% | 5% | 598 | 41 |
| Charging Decisions | 32 | 25 | 9 | 8 | 6 | 598 | 41 |
| Judicial Discretion | 11 | 7 | 7 | 10 | 13 | 598 | 41 |
| Regional Differences | 7 | 9 | 12 | 10 | 16 | 598 | 41 |
| Substantial Assistance Practices under USSG §5K1.1 | 5 | 10 | 16 | 13 | 9 | 598 | 41 |
| Early Disposition Programs ("fast track") | 4 | 5 | 7 | 4 | 5 | 598 | 41 |
| Plea Agreements: Fact Bargaining | 4 | 9 | 8 | 9 | 8 | 598 | 41 |
| Variances | 3 | 6 | 6 | 8 | 10 | 598 | 41 |
| Binding Plea Agreements under Fed. R. Crim. P. 11 (c)(1)(C ) | 3 | 9 | 8 | 5 | 6 | 598 | 41 |
| Substantial Assistance Practices under 18 USC § 3553(e) | 3 | 4 | 9 | 6 | 4 | 598 | 41 |
| Substantial Assistance Practices under Fed R. Crim P. 35 | 2 | 1 | 5 | 4 | 4 | 598 | 41 |
| Differing Circuit Case Law (e.g., different interpretations of "crime of violence") | 2 | 3 | 4 | 7 | 9 | 598 | 41 |
| Non Government-Sponsored Departures | 1 | 2 | 3 | 2 | 4 | 598 | 41 |
| Lack of Substantive Appellate Reasonableness Review | 1 | 1 | 2 | 2 | 4 | 598 | 41 |

Note. "Number" refers to respondents who ranked at least one factor. "Missing" includes respondents who did not rank any factor listed in question 16. "Percent of respondents" refers to the proportion of responding judges (598) who ranked the factor according to their perceived order of significance (1 through 5 only). Judges frequently assigned the same rank (e.g., 1) to several different factors, so that column percents do not sum to 100%. Row percents do not sum to 100% because some judges did not assign a 1 through 5 rank to each listed factor. For example, 37% of the judges did not rank statutory mandatory minimums within the top five factors, which may be interpreted either as their having no opinion about this factor or that they believed that it ranks below 5 in significance.

48

# Question 17.  General Assessment of Guidelines and Federal Sentencing

**Table 17.  Which response best reflects your view of the following statements?**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree | Total | Number | Missing |
|---|---|---|---|---|---|---|---|---|
| | | | Percent | | | | | |
| Overall, the federal sentencing guidelines have reduced unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. | 32% | 46% | 6% | 9% | 7% | 100% | 629 | 10 |
| Overall, the federal sentencing guidelines have increased certainty in meeting the purposes of sentencing. | 30 | 46 | 9 | 10 | 6 | 100% | 630 | 9 |
| Overall, the federal sentencing guidelines have increased fairness in meeting the purposes of sentencing. | 22 | 45 | 10 | 14 | 10 | 100% | 630 | 9 |

Note.   *"Number" refers to respondents who answered question.  "Missing" means that respondent did not provide any information about this question.  Percents may not sum to 100% due to rounding.*

# Question 18.  Reporting of Sentencing Data

**Table 18.  Which response best reflects your view of the statement about reporting sentencing data?**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree | Total | Number | Missing |
|---|---|---|---|---|---|---|---|---|
| | | | Percent | | | | | |
| The Commission should report judge-specific sentencing data as a means to promote transparency in sentencing. | 10% | 14% | 23% | 15% | 38% | 100% | 634 | 5 |

Note.   *"Number" refers to respondents who answered question.  "Missing" means that respondent did not provide any information about this question.  Percents may not sum to 100% due to rounding.*

# Question 19.  Purposes of Sentencing

**Table 19.  Which of the following sentencing systems do you think best achieves the purposes of sentencing?**

|  | Percent | Number |
|---|---|---|
| No guidelines, such as the system in effect before the federal sentencing guidelines became effective in 1987. | 8% |  |
| Mandatory guidelines, such as the system in effect before the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005). | 3 |  |
| The current advisory guidelines system. | 75 |  |
| A system of mandatory guidelines that comply with the Sixth Amendment (*e.g.*, with facts supporting sentencing enhancements found by a jury beyond a reasonable doubt or admitted by the defendant) and have broader sentencing ranges than currently exist, coupled with fewer statutory mandatory minimum sentencing provisions. | 14 |  |
| Total | 100% |  |
| Number |  | 634 |
| Missing |  | 5 |

Note.  *"Number" refers to respondents who answered question.  "Missing" means that respondent did not provide any information about this question.*

**APPENDIX A**
**SURVEY INSTRUMENT**

**2010 Survey of Judges on the Federal Sentencing Guidelines**



# 2010 Survey of Judges
# on
# The Federal Sentencing Guidelines

**Purpose of Survey:**

Upon the 25th anniversary of the Sentencing Reform Act of 1984, the United States Sentencing Commission is seeking information from members of the federal judiciary about sentencing practices in general and the federal sentencing guidelines in particular. During the past year, the Commission has been conducting a series of regional public hearings on federal sentencing practices and the guidelines and has heard from various stakeholders in the federal criminal justice system, including several federal district and appellate judges. This survey is intended to provide an opportunity to receive broader input from as many federal district judges as possible. The Commission intends to issue a report with possible recommendations for statutory and guideline changes in part based on the findings from the hearings and this survey.

The questions in this survey address a wide variety of sentencing issues and will be divided into the following categories: (1) statutory and structural sentencing issues; (2) sentencing hearings; (3) guideline application issues; (4) departures and variances; and (5) general assessments. You also will be given an opportunity at the end of the questionnaire to offer comments. Statutes cited in the survey are included in this packet for your convenience.

**Confidentiality:**

Information obtained about you from this questionnaire will be held in confidence; you will not be identified in any presentation of the results. Only your confidential study identification number will appear on these questionnaire pages. Identification numbers will be used solely to track response rates and allow for reminders to those judges who do not initially respond. The results of the survey will be reported only in the aggregate. Geographical differences in results may be reported, but responses from individual judges will not be identified.

**Directions:**

- Please fill in the circles completely and do not use check marks.
- Please use a soft lead pencil in case you wish to change an answer.
- When you have completed the questionnaire, please return it in the enclosed postage-paid envelope to: **2010 Survey of Judges, c/o Abt SRBI, Inc. 55 Wheeler Street; Cambridge, MA 02138.**
- If you have any questions about the survey, please call the Commission's general counsel, Kenneth Cohen at 202-502-4523.

Thank you for taking the time to complete this survey. Your input is important to the Commission.



39890



## I. Statistical and Structural Issues

**1. Consider cases you have sentenced that involved a statutory mandatory minimum provision. Indicate below whether you feel the mandatory minimum sentence was generally appropriate, generally too low, or generally too high for the following types of offenses.** *(Please mark "N/A" for "not applicable" if you have not sentenced a defendant convicted of the offense post-Kimbrough/Gall.)*

| | Appropriate | Too Low | Too High | N/A |
|---|---|---|---|---|
| All offenses with a Mandatory Minimum | O | O | O | O |
| Drug Trafficking | | | | |
| Heroin | O | O | O | O |
| Powder Cocaine | O | O | O | O |
| Crack Cocaine | O | O | O | O |
| Methamphetamine | O | O | O | O |
| Marijuana | O | O | O | O |
| Firearms Offenses | | | | |
| under 18 U.S.C. § 924 (c) | O | O | O | O |
| under 18 U.S.C. § 924 (e) | O | O | O | O |
| Child Pornography | | | | |
| Production | O | O | O | O |
| Distribution | O | O | O | O |
| Receipt | O | O | O | O |
| Other Child Exploitation Offenses | O | O | O | O |
| Aggravated Identity Theft | O | O | O | O |

2. Under 18 U.S.C. § 3553(f), often referred to as the "safety valve," a court must impose a sentence without regard to statutory mandatory minimum penalties for certain drug trafficking offenses if certain criteria are met. Below is a list of statements about possible changes to the statutory safety valve. For each statement, fill in the circle that best reflects your view.

|  | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| The statutory safety valve should be expanded to include drug trafficking offenders who have 2 or 3 criminal history points (i.e., those in Criminal History Category II). | ① | ② | ③ | ④ | ⑤ |
| The statutory safety valve should be expanded to include drug trafficking offenders who have 4, 5, or 6 criminal history points (i.e., those in Criminal History Category III). | ① | ② | ③ | ④ | ⑤ |

**A safety valve provision should be provided for the following types of offenses:**

|  | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| All offenses with a mandatory minimum | ① | ② | ③ | ④ | ⑤ |
| Drug Trafficking | ① | ② | ③ | ④ | ⑤ |
| Firearms Offenses |  |  |  |  |  |
| under 18 U.S.C. § 924 (c) | ① | ② | ③ | ④ | ⑤ |
| under 18 U.S.C. § 924 (e) | ① | ② | ③ | ④ | ⑤ |
| Child Pornography |  |  |  |  |  |
| Production | ① | ② | ③ | ④ | ⑤ |
| Distribution | ① | ② | ③ | ④ | ⑤ |
| Receipt | ① | ② | ③ | ④ | ⑤ |
| Other Child Exploitation Offenses | ① | ② | ③ | ④ | ⑤ |
| Aggravated Identity Theft | ① | ② | ③ | ④ | ⑤ |

2





39890

**3. Below is a list of statements about possible statutory changes and structural changes to the guidelines. For each statement, fill in the circle that best reflects your view.**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| Congress should amend 28 U.S.C. § 994(b)(2) to allow broader ranges on the Sentencing Table. | ① | ② | ③ | ④ | ⑤ |
| The sentencing guidelines should be "de-linked" from statutory mandatory minimum sentences (i.e., the guideline ranges should be set by the Commission independently from mandatory minimum sentences). | ① | ② | ③ | ④ | ⑤ |
| The number of categories in the loss table in USSG §2B1.1 should be decreased by broadening the monetary ranges. | ① | ② | ③ | ④ | ⑤ |
| The number of drug quantity ranges in the Drug Quantity Table in USSG §2D1.1 should be decreased by broadening the quantity ranges. | ① | ② | ③ | ④ | ⑤ |
| The number of criminal history categories in the Sentencing Table should be decreased. | ① | ② | ③ | ④ | ⑤ |
| The number of offense levels in the Sentencing Table should be decreased. | ① | ② | ③ | ④ | ⑤ |
| Some of the more generic SOC adjustments (e.g., weapon use, victim injury) in Chapter Two of the *Guidelines Manual* should be moved to Chapter Three. | ① | ② | ③ | ④ | ⑤ |

**4. Under 18 U.S.C. § 3624(b), offenders serving a term of imprisonment of more than one year may receive credit toward the service of that sentence if the offender displays exemplary compliance with institutional disciplinary regulations. Under current law, offenders may receive up to 54 days of such "good time" credit each year.**

**Do you believe the maximum amount of good time credit allowable should be: (Please mark only one choice)**

○ Unchanged

○ Reduced

○ Increased




3

## II.   Sentencing Hearings

**5.  In your view, what should be considered "relevant conduct" for purposes of sentencing?**
***Please mark all that apply.***

O   All reasonably foreseeable acts and omissions of others in furtherance of a jointly undertaken criminal activity.

O   Conduct that was charged in a court that was later dismissed.

O   Uncharged conduct that is presented at trial or admitted by the defendant in court.

O   Uncharged conduct referenced only in the Presentence Report.

O   Acquitted conduct.

**6.  Please indicate what you think the standard of proof should be for each type of fact to be established at sentencing.**

|  | Preponderance | Clear and convincing | Beyond a reasonable doubt |
|---|:---:|:---:|:---:|
| Facts establishing the base offense level | O | | O |
| Facts supporting adjustments to the base offense level | O | O | O |
| Facts supporting departures | O | O | O |
| Facts supporting variances | O | O | O |

**7.  Below is a list of statements about possible changes relating to how federal sentencing protects the interests of crime victims. For each statement or possible change, fill in the circle that best reflects your view.**

|  | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|:---:|:---:|:---:|:---:|:---:|
| The interests of crime victims generally are adequately protected under current federal sentencing procedures. | ① | ② | ③ | ④ | ⑤ |
| Presentence reports should be required to include information a victim wishes to be included in the report. | ① | ② | ③ | ④ | ⑤ |
| Portions of presentence reports, including descriptions of the offense conduct and guidelines calculations, should be disclosed to victims. | ① | ② | ③ | ④ | ⑤ |
| Victims should have the opportunity to comment on the presentence report, including on disputed guideline factors, before the sentence is imposed. | ① | ② | ③ | ④ | ⑤ |
| Congress should amend the restitution statutes to more broadly define the term "victim" to include persons who suffer any harm, injury, or loss that would have not occurred but for the defendant's crime. | ① | ② | ③ | ④ | ⑤ |
| Congress should amend the restitution statutes to more broadly provide for compensation to victims, including for emotional distress or other consequential harm or loss that the victim suffered as a result of the defendant's crime. | ① | ② | ③ | ④ | ⑤ |
| Courts should have the authority to order restitution to victims in all cases. | ① | ② | ③ | ④ | ⑤ |





39890

4

## III.  Guideline Application

**8.  Considering cases in which you have sentenced defendants in the <u>last two years</u> (i.e., since the Supreme Court's decisions in *Kimbrough v. United States*, 552 U.S. ___, 128 S. Ct. 558 (Dec. 11, 2007), and *Gall v. United States*, 552 U.S. ___, 128 S. Ct. 586 (Dec. 11, 2007)), indicate if you felt the applicable guideline range was generally appropriate, generally too low, or generally too high for the following types of offenses.** *(Please mark "N/A" for "not applicable" if you have not sentenced a defendant convicted of the offense post-Kimbrough/Gall.)*

|  | Appropriate | Too Low | Too High | N/A |
|---|---|---|---|---|
| Murder | O | O | O | O |
| Manslaughter | O | O | O | O |
| Assault | O | O | O | O |
| Fraud | O | O | O | O |
| Larceny/Theft/Embezzlement | O | O | O | O |
| Drug Trafficking |  |  |  |  |
|    Heroin | O | O | O | O |
|    Powder Cocaine | O | O | O | O |
|    Crack Cocaine | O | O | O | O |
|    Methamphetamine | O | O | O | O |
|    Marijuana | O | O | O | O |
|    Ecstasy | O | O | O | O |
|    Oxycodone | O | O | O | O |
| Child Pornography |  |  |  |  |
|    Production | O | O | O | O |
|    Distribution | O | O | O | O |
|    Receipt | O | O | O | O |
|    Possession | O | O | O | O |
| Other Child Exploitation Offenses | O | O | O | O |
| Firearms | O | O | O | O |
| Alien Smuggling | O | O | O | O |
| Illegal Reentry into the U.S. | O | O | O | O |

**9.  Below is a list of statements about possible changes to the guidelines concerning role in the offense (USSG §3B1.1 (Aggravating Role) and §3B1.2 (Mitigating Role)).  For each statement, fill in the circle that best reflects your view.**

|  | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| The distinction between a "minor" and "minimal" participant should be explained more clearly. | ① | ② | ③ | ④ | ⑤ |
| The distinction between an "organizer/leader" and a "manager/supervisor" should be explained more clearly. | ① | ② | ③ | ④ | ⑤ |
| The range of adjustments based on role in the offense should be increased (i.e., allow adjustments for role in the offense greater than 4 levels). | ① | ② | ③ | ④ | ⑤ |

5



39890



**10. Below is a list of statements about possible changes relating to how the Criminal History Category is calculated under Chapter Four of the *Guidelines Manual*.  For each statement, fill in the circle that best reflects your view.**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| The combined impact of "recency" points and "status" points under USSG §4A1.1(d) and (e) should be reduced. | ① | ② | ③ | ④ | ⑤ |
| Misdemeanor careless or reckless driving should always be excluded from criminal history computations. | ① | ② | ③ | ④ | ⑤ |
| Misdemeanor driving without a license or with a revoked or suspended license should always be excluded from criminal history computations. | ① | ② | ③ | ④ | ⑤ |
| Misdemeanor insufficient funds check should always be excluded from criminal history computations. | ① | ② | ③ | ④ | ⑤ |
| Misdemeanor disorderly conduct or disturbing the peace should always be excluded from criminal history computations. | ① | ② | ③ | ④ | ⑤ |
| Misdemeanor loitering offenses should always be excluded from criminal history computations. | ① | ② | ③ | ④ | ⑤ |
| Misdemeanor public intoxication offenses should always be excluded from criminal history computations. | ① | ② | ③ | ④ | ⑤ |
| Offenses committed prior to the age eighteen should always be excluded from criminal history computations. | ① | ② | ③ | ④ | ⑤ |
| Sentences resulting from tribal court convictions should be included in criminal history computations. | ① | ② | ③ | ④ | ⑤ |
| The applicable time periods for counting prior offenses under USSG §4A1.2(e) (i.e., the "decay factor") should be shortened. | ① | ② | ③ | ④ | ⑤ |
| The career offender provisions at USSC §§4B1.1 and 4B1.2 should be amended to apply only to offenders described in 28 U.S.C. § 994(h). | ① | ② | ③ | ④ | ⑤ |

6





39890

**11. The sentencing guidelines are required by statute to provide a means to determine the type of sentence to impose: probation, a fine, or a term of imprisonment. Accordingly, the Sentencing Table is divided into zones that determine the availability of the type of guideline sentence to impose. Please indicate whether you believe the following types of alternative sentences should be made _more_ available for each offense type. For each offense type, fill in the circle for each type of sentence, if any, that you believe should be made _more_ available. If you do _not_ think a particular type of sentence should be made more available, leave the circles _blank_.**

|  | Straight Probation | Probation with Community or Home Confinement | Split Sentencing of Imprisonment and Community or Home Confinement |
|---|---|---|---|
| Murder | O | O | O |
| Manslaughter | O | O | O |
| Assault | O | O | O |
| Fraud | O | O | O |
| Larceny/Theft/Embezzlement | O | O | O |
| Drug Trafficking |  |  |  |
|    Heroin | O | O | O |
|    Powder Cocaine | O | O | O |
|    Crack Cocaine | O | O | O |
|    Methamphetamine | O | O | O |
|    Marijuana | O | O | O |
|    Ecstasy | O | O | O |
|    Oxycodone | O | O | O |
| Child Pornography |  |  |  |
|    Production | O | O | O |
|    Distribution | O | O | O |
|    Receipt | O | O | O |
|    Possession | O | O | O |
| Other Child Exploitation Offenses | O | O | O |
| Firearms | O | O | O |
| Alien Smuggling | O | O | O |
| Illegal Reentry into the U.S. | O | O | O |

**12. Below is a list of questions and statements about possible changes relating to supervised release. For each question or statement, fill in the circle that best reflects your view.**

|  | Appropriate | Too Low | Too High |
|---|---|---|---|
| The number of cases in which the guidelines provide for supervised release generally is... | O | O | O |
| The lengths of the terms of supervised release terms provided by the guidelines generally are... | O | O | O |
| The ranges of punishment for violations of supervised release provided by the policy statements in Chapter Seven, Part B of the _Guidelines Manual_ generally are... | O | O | O |

|  | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| The minimum terms of supervised release provided in USSG §5D1.2 should be eliminated. | ① | ② | ③ | ④ | ⑤ |





39890

## IV.  Departures and Variances

**13. For each offender characteristic listed below, fill in the appropriate circle to indicate each way in which you think this factor should be considered at sentencing. Fill in as many circles as needed in each row to express your views.**

| Policy Statement where applicable | Characteristic | Ordinarily relevant to within-range determination | Not ordinarily relevant to within-range determination | Ordinarily relevant to departure and/or variance consideration | Not ordinarily relevant to departure and/or variance consideration | Never relevant |
|---|---|---|---|---|---|---|
| 5H1.1 | Age | O | O | O | O | O |
| 5H1.2 | Education | O | O | O | O | O |
| 5H1.2 | Vocational Skills | O | O | O | O | O |
| 5H1.3 | Mental Condition | O | O | O | O | O |
| 5H1.3 | Emotional Condition | O | O | O | O | O |
| 5H1.4 | Physical Condition | O | O | O | O | O |
| 5H1.4 | Drug Dependence | O | O | O | O | O |
| 5H1.4 | Alcohol Dependence | O | O | O | O | O |
| 5H1.4 | Gambling Addiction | O | O | O | O | O |
| 5H1.5 | Employment Record | O | O | O | O | O |
| 5H1.6 | Family Ties and Responsibilities | O | O | O | O | O |
| 5H1.6 | Community Ties | O | O | O | O | O |
| 5H1.9 | Dependence on Criminal Livelihood | O | O | O | O | O |
| | Stress Related to Military Service | O | O | O | O | O |
| 5H1.11 | Civic, Charitable, or Public Service | O | O | O | O | O |
| 5H1.11 | Employment-related Contributions | O | O | O | O | O |
| 5H1.11 | Prior Good Works | O | O | O | O | O |
| 5H1.12 | Lack of Guidance as a Youth | O | O | O | O | O |
| 5H1.12 | Disadvantaged Upbringing | O | O | O | O | O |
| 5K2.13 | Diminished Capacity | O | O | O | O | O |
| 5K2.16 | Voluntary Disclosure of Offense | O | O | O | O | O |
| 5K2.19 | Post-Sentencing Rehabilitative Efforts | O | O | O | O | O |
| | Post-Offense Rehabilitative Efforts | O | O | O | O | O |
| 5K2.20 | Aberrant Behavior | O | O | O | O | O |
| | Exceptional Efforts to Fulfill Restitution Obligations | O | O | O | O | O |
| | Undue Influence related to affection, relationship, or fear of other offender(s) | O | O | O | O | O |

8





39890

**14. Considering cases in which you have sentenced defendants in the <u>last two years</u> (i.e., since the Supreme Court's decisions in *Kimbrough v. United States*, 552 U.S. ___, 128 S. Ct. 558 (Dec. 11, 2007), and *Gall v. United States*, 552 U.S. ___, 128 S. Ct. 586 (Dec. 11, 2007)), and in which the sentence imposed constituted a variance from the applicable guideline range, indicate the reason why you chose not to rely on a departure provision in the *Guidelines Manual*. Please select <u>all</u> that apply.** *(Please mark "N/A for not applicable if you have not imposed a sentence that constituted a variance post-Kimbrough/Gall.)*

- ○ N/A
- ○ The *Guidelines Manual* does not contain a departure provision that adequately reflects the reason for the sentence outside the guideline range.
- ○ Departure policy statements in the *Guidelines Manual* were too restrictive.
- ○ Circuit case law regarding departures was too restrictive.
- ○ Departure policy statements are inconsistent with the factors under 18 U.S.C. § 3553(a).
- ○ Departures are subject to heightened procedural requirements(e.g., notice requirements under Fed. R. Crim. P. 32(h)).
- ○ Departures are subject to stricter appellate review than variances.

**15. Below is a list of statements and/or possible changes relating to substantial assistance. For each statement or possible change, fill in the circle that best reflects your view.**

| | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| Congress should amend 18 U.S.C. § 3553(e) to authorize judges to sentence a defendant below the applicable statutory mandatory minimum to reflect a defendant's substantial assistance, even if the government does not make a motion. | ① | ② | ③ | ④ | ⑤ |
| The Commission should amend USSG §5K1.1 to authorize judges to sentence below the applicable guideline range to reflect a defendant's substantial assistance, even if the government does not make a motion. | ① | ② | ③ | ④ | ⑤ |
| The Federal Rules of Criminal Procedure should be amended to authorize judges to reduce a defendant's sentence under Rule 35(b) if the defendant, after sentencing, provides the required assistance, even if the government does not make a motion. | ① | ② | ③ | ④ | ⑤ |
| The Commission should amend §5K1.1 to provide additional guidance regarding the extent to which a court may depart under that provision (i.e., provide specific guidance on the number of offense levels recommended for departures based on the factors enumerated in USSG 5K1.1). | ① | ② | ③ | ④ | ⑤ |
| The Commission should amend §5K1.1 to provide additional guidance regarding evaluation of the nature and extent of the assistance provided. | ① | ② | ③ | ④ | ⑤ |
| The Commission should amend §5K1.1 to provide additional guidance regarding evaluation of the results obtained through the assistance provided. | ① | ② | ③ | ④ | ⑤ |
| In determining the extent of a reduction below the statutory mandatory minimum under 18 U.S.C. § 3553(e) or Fed. R. Crim. P. 35(b), the court's consideration should not be limited to the nature of the defendant's substantial assistance but also should include consideration of the factors at 18 U.S.C. § 3553(a). | ① | ② | ③ | ④ | ⑤ |

9





39890

## V.   General Assessment

**16. To the extent, if any, you believe unwarranted sentencing disparities exist, indicate the 5 most significant contributors from the following list of factors in rank order (1 indicates the most significant contributor; 5 indicates the 5th most significant contributor).  Please select only 5 from the list below.**

|  | Rank 1 thru 5 |
|---|---|
| Statutory mandatory minimums | _____ |
| Charging decisions | _____ |
| Plea agreements | |
|     Binding plea agreements under Fed. R.Crim.P.11 (c)(1)(C) | _____ |
|     Fact bargaining | _____ |
| Substantial assistance practices | |
|     Under 18 U.S.C. § 3553(e) | _____ |
|     Under USSG §5K1.1 | _____ |
|     Under Fed. R. Crim. P. 35 | _____ |
| Early disposition programs ("fast track") | _____ |
| Judicial Discretion | _____ |
| Non-government-sponsored departures | _____ |
| Variances | _____ |
| Lack of substantive appellate reasonableness review | _____ |
| Differing circuit case law (e.g., different interpretations of "crime of violence") | _____ |
| Regional differences | _____ |

**17. Below is a list of statements regarding federal sentencing and the guidelines in general.  For each statement, fill in the circle that best reflects your view.**

|  | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| Overall, the federal sentencing guidelines have reduced unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. | ① | ② | ③ | ④ | ⑤ |
| Overall, the federal sentencing guidelines have increased certainty in meeting the purposes of sentencing. | ① | ② | ③ | ④ | ⑤ |
| Overall, the federal sentencing guidelines have increased fairness in meeting the purposes of sentencing. | ① | ② | ③ | ④ | ⑤ |


9  9  9  9  9  9


39890

10

**18. Below is a statement regarding the reporting of federal sentencing data. Fill in the circle that best reflects your view.**

|  | Strongly Agree | Somewhat Agree | Neutral | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| The Commission should report judge-specific sentencing data as a means to promote transparency in sentencing. | ① | ② | ③ | ④ | ⑤ |

**19. Which of the following sentencing systems do you think best achieves the purposes of sentencing? Please mark only one choice.**

- ○ No guidelines, such as the system in effect before the federal sentencing guidelines became effective in 1987.
- ○ Mandatory guidelines, such as the system in effect before the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005).
- ○ The current advisory guidelines system.
- ○ A system of mandatory guidelines that comply with the Sixth Amendment (e.g., with facts supporting sentencing enhancements found by a jury beyond a reasonable doubt or admitted by the defendant) and have broader sentencing ranges than currently exist, coupled with fewer statutory mandatory minimum sentencing provisions.

**20. Clarification and/or Comments**

The Commission welcomes all comments that you believe will help the Commission in its analysis of how the current guidelines system is meeting the statutory purposes of sentencing. You are also encouraged to provide your thoughts regarding the statutory definitions of the purposes of sentencing, problem areas you are experiencing with sentences under the guidelines, research areas you would like to see the Commission address or any other topic you wish to raise. *Attach additional paper if needed.*

_____

_____

_____

_____

_____

_____

_____

Thank you for taking the time to complete this questionnaire. Your input is important to the Commission. Please mail this completed questionnaire in the postage-paid envelope as soon as possible. Please return questionnaire to: **2010 Survey of Judges, c/o Abt SRBI, Inc. 55 Wheeler Street; Cambridge, MA 02138**





39890

11